[No. 13748-1-III.    Division Three.    October 10, 1996.]

THE STATE OF WASHINGTON, *Respondent*, v.
BENJAMIN RICHARD HULL, *Appellant.*

*John A. Moore, Jr.*, for appellant.

*Jeffrey C. Sullivan, Prosecuting Attorney*, and *Bruce Hanify, Deputy*, for respondent.

THOMPSON, J. — After failing once to cut off his injured leg with a chain saw, Benjamin R. Hull tried to shoot it off

with a shotgun, and then accepted state Department of Labor and Industries (L&I) benefits for the injury. He appeals his conviction for L&I fraud, contending primarily that the court's instructions failed to include necessary elements of or defenses to the crime. We agree and reverse.

Mr. Hull seriously injured his left knee in an industrial accident in 1973. During the next several years, he underwent three surgeries and received various other L&I benefits.

The surgeries did not relieve Mr. Hull's pain. In 1982, after the second surgery, his doctor said there was nothing more that could be done medically short of a total knee replacement, which the doctor viewed as "old man's surgery." Mr. Hull began taking high doses of powerful pain-killing medications. Mr. Hull's mother, who was dying of bone cancer, provided some of the strongest drugs.

Mr. Hull began to think about amputation as a solution. He testified the idea "just kind of grew on me. I just figured that if [the leg] was gone, what isn't there wouldn't hurt." Unable to find a doctor who would amputate the leg, Mr. Hull decided to do the job himself. In 1986, two weeks after his brother committed suicide, Mr. Hull recruited a friend to help him to cut off his leg below the knee with a chain saw.

A  [T]he idea was to cut it off so closely that in order to close the stump they'd have to take the knee off as well. The fleshy parts above the knee are a much greater risk of loss of life and I wanted to live, sir. I wanted to be able to live.

Q  So it was a question of getting it high enough where you'd wreck the knee but not high enough where you'd die?

A  That's correct.

Mr. Hull staged the event as an accident, believing the truth would cause his mentally ill wife to attempt suicide. The chain saw stalled twice when it struck Mr. Hull's bone, and the amputation failed. The wound healed

quickly; as Mr. Hull testified: "I missed everything important unfortunately."

Mr. Hull's pain continued. His renewed claim for L&I medical benefits was delayed for six months before the department approved a third surgery on his knee. By 1990, according to a psychologist, Mr. Hull was addicted to pain medication, and was suffering from major depression brought on by the persistent pain, "negative interactions with the health care system," and various family problems. His mother's death took away his source for potent pain killers. Mr. Hull began to plan again to amputate his leg, this time with a shotgun blast. He acquired a gun and recruited his loyal friend to help again.

On January 2, 1991, the two men met at Mr. Hull's Sunnyside workplace, which Mr. Hull claims they chose because it was near a telephone and emergency care would arrive quickly. Just outside the door, Mr. Hull leaned the shotgun against his friend's hip and pulled the trigger, blasting a hole in his left leg below the knee.[1] His friend helped Mr. Hull inside so he could summon help, then left with the shotgun, which he threw into the Yakima River.

The men concocted a story blaming the shooting on a group of Hispanic men whom Mr. Hull interrupted while working late. From his hospital bed, Mr. Hull helped a police artist compile a composite drawing of one of his imaginary assailants.

When Mr. Hull entered the emergency room at Sunnyside Community Hospital, employees quickly began working on health insurance claim forms. The receptionist started filling out the form for Mr. Hull's private medical plan, but switched to an L&I form, concluding for unexplained reasons that Mr. Hull had been injured at work. Mr. Hull was not able to sign the form. Weeks later, after Mr. Hull had been transferred to Harborview Medical Center in Seattle, an L&I employee visited his room and

---

[1]Doctors later amputated Mr. Hull's leg below the knee, retaining the source of his agony. Ironically, Mr. Hull said his knee stopped hurting after the amputation.

asked him to sign another form to complete the claim. Mr. Hull testified he was heavily sedated at the time, and does not remember the visit or signing the document.

Shortly after the shooting, L&I received the first, unsigned claim for benefits. After its employee obtained Mr. Hull's signature in the hospital, L&I regularly sent forms directly to Mr. Hull for his signature; Mr. Hull regularly completed, signed, and returned those forms until October 1991. When the agency asked in writing if there were any third parties potentially responsible for the injury, or if there were any witnesses, Mr. Hull responded by writing "no idea" and "unknown." Mr. Hull received approximately $96,000 in benefits.

More than a year after the shooting, Mr. Hull confessed to investigators that he had shot himself.[2] However, he denied he intended to defraud L&I:

Q Why did you shoot your leg off?

A I shot my leg off because I wanted to live.

Q What do you mean by that?

A I meant that the life I was living the way I was going, the amount of help I believed I could get from the agency that was supposed to take care of me was death by inches. Pretty soon I would be forced to do what Dr. Irwin offered me and that is lie on my back and watch television and take pain pills. That to me is suicide. I didn't want to die. I wanted to live. If living meant a new leg, fine, but I wanted to live.

Q Oh, didn't you do all this to get money from L & I?

A No, sir. I believe the record will — as — will show that the first report I made was to Sunnyside General Hospital. And they asked me who was going to pay for it.

And I wrote down my [G]roup [H]ealth number in the box.

---

[2]As one witness testified, intentional self-injury is a ground for automatic rejection of an L&I claim.

After he began receiving L&I benefits, Mr. Hull continued to sign and return the claim forms, and accept the benefits, because he believed the claim "had its genesis back in '73."

The State charged Mr. Hull with first-degree theft, RCW 9A.56.030. It later added a charge of providing false information claiming L&I benefits, RCW 51.48.020(2). Its amended information alleged:

> [O]n or about between January 2, 1991 and March 1, 1992, in Yakima County, Washington, [Mr. Hull] did knowingly give false information in his claim and application for Labor and Industries benefits which resulted in the defendant obtaining Labor and Industries benefits including compensation and medical benefits in excess of $1,500 to which he was not entitled.

Over defense counsel's objection after the State had rested its case, the prosecutor amended the information again, as follows:

> [O]n or about between January 2, 1991 and March 1, 1992, in Yakima County, Washington, [Mr. Hull] did knowingly give false information *required* in his claim and application for Labor and Industries benefits which resulted in the defendant obtaining Labor and Industries benefits including compensation and medical benefits in excess of $1,500 to which he was not entitled[.]

(Emphasis added.)

The jury was unable to reach a verdict on the theft count, but found Mr. Hull guilty of the L&I fraud count. By special verdict, the jury found the value of the benefits obtained was more than $1,500. The trial court calculated the standard sentencing range at 0 to 90 days, but ordered an exceptional sentence of 10 months.[3]

Although we reverse the conviction because of an

---

[3]The court's findings and conclusions in support of the exceptional sentence ordered a "sentence of 9 months in total confinement which maybe [sic] served in work release if eligible . . . ." However, the judgment and sentence ordered a 10-month sentence, with nine months to be served in jail and the remainder to be

improper amendment of the information, we also address several other issues that may arise on remand.

## I. DOUBLE JEOPARDY

■ ■ Mr. Hull argues the two-count information violated his right against double jeopardy. The double jeopardy clauses of the Fifth Amendment and article I, section 9 of the Washington Constitution prohibit multiple punishments for the same offense.[4] *State v. Calle*, 125 Wn.2d 769, 888 P.2d 155 (1995); *State v. Maxfield*, 125 Wn.2d 378, 886 P.2d 123 (1994).

Under the "same evidence" rule of construction which this court adopted in 1896, the defendant's double jeopardy rights are violated if he or she is convicted of offenses that are identical both in fact and in law. [*State v.*] *Johnson*, 96 Wn.2d [926,] . . . 933[, 639 P.2d 1332 (1982)]; *State v. Roybal*, 82 Wn.2d 577, 581, 512 P.2d 718 (1973) (quoting *State v. Reiff*, 14 Wash. 664, 667, 45 P. 318 (1896)). However, if each offense, as charged, includes elements not included in the other, the offenses are different and multiple convictions can stand. *In re Fletcher*, 113 Wn.2d 42, 49, 776 P.2d 114 (1989); [*State v.*] *Vladovic*, [99 Wn.2d 413,] . . . 423[, 662 P.2d 853 (1983)]. As this court stated in *Vladovic,*

> In order to be the "same offense" for purposes of double jeopardy the offenses must be the same in law and in fact. If there is an element in each offense which is not included in the other, and proof of one offense would not necessarily also prove the other, the offenses are not constitutionally the same and the double jeopardy clause does not prevent convictions for both offenses.

*Vladovic*, at 423, *cited in Fletcher*, at 47.

Washington's "same evidence" test is very similar to the rule set forth in *Blockburger v. United States*, 284 U.S. 299, 304, 76 L. Ed. 306, 52 S. Ct. 180 (1932):

---

served in partial confinement in a work-release program. Neither party has addressed the inconsistency.

[4] The clauses also protect against successive prosecutions for the same offense after conviction or acquittal. *See Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 306-07, 104 S. Ct. 1805, 80 L. Ed. 2d 311 (1984). The instant case involves only a single prosecution.

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Blockburger*, at 304.

*Calle*, 125 Wn.2d at 777-78 (footnote omitted).

A person commits first-degree theft by wrongfully obtaining or exerting unauthorized control over another's property valued at more than $1,500 with intent to deprive the person of the property. RCW 9A.56.020(1)(a); RCW 9A.56.030(1)(a). The L & I fraud statute provides:

> Any person claiming benefits under this title, who knowingly gives false information required in any claim or application under this title shall be guilty of a felony, or gross misdemeanor in accordance with the theft and anticipatory provisions of Title 9A RCW.

RCW 51.48.020(2). Arguably, the L&I fraud statute requires that a person knowingly give false information required in a claim, while the theft statute requires an intent to deprive another person of property. Under a conclusively presumptive application of the *Blockburger* and "same evidence" tests, then, the crimes are not the same offense for double jeopardy purposes.

Nevertheless, recognizing that the *Blockburger* and "same evidence" tests are merely rules of statutory construction to aid in determining legislative intent, *see Calle*, 125 Wn.2d at 778-80, we conclude theft and L&I fraud are the same offense for double jeopardy purposes. As the Supreme Court noted in *Calle*, Washington courts have held two offenses are the same (despite the application of the *Blockburger* and "same evidence" tests) when "there is a clear indication of contrary legislative intent." *Calle*, 125 Wn.2d at 778 (citing *Albernaz v. United States*, 450 U.S. 333, 340, 101 S. Ct. 1137, 1143, 67 L. Ed. 2d 275 (1981)); *see State v. Johnson*, 92 Wn.2d 671, 600 P.2d 1249 (1979), *cert. dismissed*, 446 U.S. 948 (1980); *State v. Birgen*,

33 Wn. App. 1, 651 P.2d 240 (1982), *review denied*, 98 Wn.2d 1013 (1983); *State v. Potter*, 31 Wn. App. 883, 645 P.2d 60 (1982).

We conclude there is a clear indication of legislative intent that L&I fraud be treated as another, more specific, species of theft. First, RCW 51.48.020(2) itself uses the phrase, "in accordance with the theft and anticipatory provisions of Title 9A RCW."[5] Second, as we discuss more fully below, because the L&I fraud statute incorporates the degrees of theft, the value of the benefits obtained is an element of the crime of L&I fraud. Finally, proof of L&I fraud will almost invariably also establish the technical elements of theft. *See Potter*, 31 Wn. App. at 888. We therefore conclude that theft and L&I fraud are the same offense for double jeopardy purposes, and the State improperly charged Mr. Hull with both crimes.[6]

## II. "To Convict" Instruction

The State's final information alleged that the L&I fraud occurred in Yakima County and that Mr. Hull obtained "benefits including compensation and medical benefits in excess of $1,500 to which he was not entitled." However, the trial court rejected Mr. Hull's proposed "to convict" instruction on the elements of the crime, which included requirements that the jury find the acts occurred in Yakima County and that Mr. Hull obtained "[b]enefits

---

[5]We have found no reported decision that interprets this language, which was adopted in 1987. *See* Laws of 1987, ch. 221, § 1. Before the 1987 amendment, the statute provided:

"Any person claiming benefits under this title, who knowingly gives false information required in any claim or application under this title shall be guilty of a class C felony when such claim or application involves an amount of five hundred dollars or more. When such claim or application involves an amount less than five hundred dollars, the person giving such information shall be guilty of a gross misdemeanor."

Laws of 1977, Ex. Sess., ch. 323, § 22.

[6]*Our reversal of the conviction is not based on this ground, however. Mr. Hull was convicted of only one crime, and there has been no double jeopardy violation. On remand, however, the State should charge Mr. Hull with no more than one of the two crimes.*

including compensation and medical benefits in excess of $1,500 to which he was not entitled." The court's instruction provided:

> To convict the defendant of the crime of Providing False Information While Claiming Labor and Industries Benefits as contained in Count II, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> 1. That on or about between January 1, 1991 and March 1, 1992 the defendant gave information required in an application or claim for Labor and Industries benefits;
>
> 2. That the defendant knew the information given in his application or claim for Labor and Industries benefits was false; and
>
> 3. That the acts occurred in the State of Washington.
>
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all the evidence you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

The court's special verdict form asked the jury to determine the value of the benefits obtained:

> USE THIS FORM ONLY IF YOU HAVE FOUND THE DEFENDANT GUILTY ON COUNT II.
>
> Do all twelve jurors find, beyond a reasonable doubt, as previously defined, with regard to Count II: Providing False Information While Claiming Labor and Industries Benefits, that the value of the benefits obtained:

|   |   | Yes | No |
|---|---|---|---|
| 1. | Were more than $1,500 | ___ | ___ |
| 2. | Were more than $250 but less than $1,500 | ___ | ___ |
| 3. | Were less than $250 | ___ | ___ |

Mr. Hull argues that, by the reference in RCW

51.48.020(2) to "the theft and anticipatory provisions of Title 9A RCW," the statute incorporated the distinctions between first-, second-, or third-degree theft, depending on the value of the property or services involved. *See* RCW 9A.56.030-.050. Thus, he contends, because the seriousness of the offense depends on the value of the benefits claimed, this value is an element of the crime, which the trial court should have included in the "to convict" instruction.

Both parties rely on interpretations of RCW 74.08.331, which provides that persons who commit welfare fraud "shall be guilty of grand larceny and upon conviction thereof shall be punished by imprisonment in a state correctional facility for not more than fifteen years." However, RCW 9A.56.100 provides that "[a]ll offenses defined as larcenies outside of this title shall be treated as thefts as provided in this title." Several Supreme Court decisions address the ambiguity of the phrase "shall be treated as thefts." *See State v. Campbell*, 125 Wn.2d 797, 888 P.2d 1185 (1995); *State v. Delcambre*, 116 Wn.2d 444, 805 P.2d 233 (1991); *State v. Holmes*, 98 Wn.2d 590, 657 P.2d 770 (1983); *State v. Sass*, 94 Wn.2d 721, 620 P.2d 79 (1980). The court recently summarized these holdings by concluding that the crime of welfare fraud incorporates the degrees of theft. *Campbell*, 125 Wn.2d at 803. Therefore, the court concluded, the dollar value of the unlawfully obtained benefits is an essential element of the crime of welfare fraud. *Id.* at 802-04.[7]

■ Of course, the L&I fraud statute does not define its violation as a larceny, nor does it use the precise phrase ("shall be treated as thefts") contained in RCW 9A.56.100. Nevertheless, the L&I fraud statute's language ("shall be guilty of a felony, or gross misdemeanor in accordance with the theft and anticipatory provisions of Title 9A

---

[7]The pattern "to convict" instruction for the crime of welfare fraud requires the jury to consider the value of the benefits obtained. It includes as an essential element: "(3) That the public assistance to which the [defendant] [other person] was not entitled [exceeded $1,500 in value] [exceeded $250 in value [but did not exceed $1,500 in value]] [did not exceed $250 in value] [was of some value]." WPIC 70.16.

RCW") reflects a similar legislative purpose. We therefore conclude that the Supreme Court's analysis of the welfare fraud statute applies to the L&I fraud statute as well, and the value of the benefits obtained is an essential element of the crime.

■■ Here, the information properly contained an allegation regarding the value of the benefits Mr. Hull obtained. However, the "to convict" instruction omitted value as an essential element. Due process requires that the State prove each element of a crime, and the instructions must inform the jury as to each element. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State v. Byrd*, 125 Wn.2d 707, 713-14, 887 P.2d 396 (1995). Thus, because value is an element of the crime of L&I fraud, the "to convict" instruction violated Mr. Hull's due process right because it instructed jurors to find him guilty if it found the State had proved three elements, not including the value of the benefits.[8]

■ Mr. Hull also contends the trial court erred by using the words "State of Washington" in the "to convict" instruction instead of the information's language, "Yakima County, Washington." However, proper venue is not an element of a crime. *State v. Hobbs*, 71 Wn. App. 419, 423, 859 P.2d 73 (1993). Inclusion of the venue element in an information or in a "to convict" instruction is viewed as surplusage. *Id.* at 425. The change therefore had no effect on Mr. Hull's conviction.

■ In addition, Mr. Hull argues the information's language became the law of the case, and should have been included in the jury instruction on that basis. However, unnecessary elements become law of the case only after they have been included in the jury instruc-

---

[8]Despite the error, we do not reverse on this basis. Omitting an element in a "to convict" instruction is harmless if proof of the element is overwhelming. *State v. Bailey*, 114 Wn.2d 340, 348-50, 787 P.2d 1378 (1990). There was no factual dispute that the value of benefits Mr. Hull received exceeded $1,500. Moreover, the jurors' response to the special verdict inquiry required them to determine the value beyond a reasonable doubt. The omission of the value element in the "to convict" instruction did not prejudice Mr. Hull.

tions. *State v. Lee*, 128 Wn.2d 151, 159, 904 P.2d 1143 (1995). Unlike *Hobbs*, in which the county venue element was included in the instruction at the prosecutor's request, the court's instruction here did not include the "Yakima County, Washington" language, and did not become the law of the case.

### III. GOOD-FAITH CLAIM OF TITLE

On cross-examination, Mr. Hull testified:

Q So when each one of those things were signed, you knew that you were going to receive money as a result?

A Yes, sir.

Q And you knew if you didn't sign those, you weren't going to get any money.

A That's correct.

Q And when you got those checks, you endorsed those checks and took the money from them, took the money from them —

A (Indicating) I'm waiting for the rest of the question, sir.

Q That's the question. Do you agree that you took the money from those checks.

A I agree that I accepted the money from those checks on the basis of the original 1973 incident, yes, sir.

Q You didn't tell anybody that, did you?

A I didn't think I had to.

Q You knew that all those checks that were coming to you were the result of your fraud in saying that this happened as a result of an assault on January 2, 1991, right?

A I'll disagree with that statement, Mr. Hansen.

Q You didn't know that it came as a result of that?

A It came as a result of the actions I was forced to take because of the 1973 legitimate injury.

Later, Mr. Hull admitted he had provided false information to L&I:

Q You gave them false information, correct?

A Pursuant to the 1973 incident, yes, sir.

Q And you knew that if you told the truth you would not receive any more benefits, you would have been determined ineligible?

A I didn't know that for sure.

Q You didn't know it for sure?

A Oh, I suppose I could have gone through some legal hassle.

Q You knew that was what was going to happen, right?

A Probably.

On the basis of this testimony, Mr. Hull proposed a jury instruction on the defense of good-faith claim of title. *See* WPIC 19.08. The trial court refused.

■ Mr. Hull contends he was entitled to a jury instruction pursuant to RCW 9A.56.020(2), which provides:

> In any prosecution for theft, it shall be a sufficient defense that the property or service was appropriated openly and avowedly under a claim of title made in good faith, even though the claim be untenable.

Failure to include this instruction when the evidence supports the defense is reversible error. *State v. Pestrin*, 43 Wn. App. 705, 710, 719 P.2d 137 (1986). However, the defense is not available when the defendant uses patently deceptive means to accomplish the theft. *Id.* Here, Mr. Hull may have believed he was entitled to benefits as a consequence of his original injury, but he undeniably provided false information to L&I, knowing the truth would have made him ineligible for benefits. On the evidence presented, he did not make his claim "openly and avowedly under a claim of title," and the trial court properly declined to include the instruction.

### IV. AMENDMENT OF THE INFORMATION

■ ■ CrR 2.1(d) provides for amendment of an infor-

mation "at any time before verdict or finding if substantial rights of the defendant are not prejudiced." This rule permits liberal amendment of informations before trial, but is limited by WASH. CONST. art. 1, § 22 (amend. 10), which requires that a defendant be adequately informed of a charge he is to meet at trial. *State v. Pelkey*, 109 Wn.2d 484, 487-90, 745 P.2d 854 (1987).

> The constitutionality of amending an information after trial has already begun presents a different question. All of the pretrial motions, voir dire of the jury, opening argument, questioning and cross examination of witnesses are based on the precise nature of the charge alleged in the information. Where a jury has already been empaneled, the defendant is highly vulnerable to the possibility that jurors will be confused or prejudiced by a variance from the original information.

*Id.* at 490. The *Pelkey* court articulated a bright-line rule: "A criminal charge may not be amended after the State has rested its case in chief unless the amendment is to a lesser degree of the same charge or a lesser included offense." *Id.* at 491. An amendment under these circumstances is reversible error per se, and the defense is not required to show prejudice. *State v. Markle*, 118 Wn.2d 424, 437, 823 P.2d 1101 (1992); *cf. State v. Schaffer*, 120 Wn.2d 616, 621, 845 P.2d 281 (1993) (distinguishing between midtrial amendments *before* and *after* the close of the State's case in chief).

The State argues the bright-line *Pelkey* rule should not apply in this case, because the final amendment of the information did not allege a new and different crime, but merely added the word "required," which had been omitted inadvertently in the earlier informations.

The Supreme Court rejected this argument in *State v. Vangerpen*, 125 Wn.2d 782, 888 P.2d 1177 (1995), in which an information purporting to allege attempted first-degree murder inadvertently omitted the statutory element of premeditation. *Id.* at 785. After the State had rested its case, the trial court granted a motion to amend the infor-

mation to correct the omission. *Id.* at 785-86. The Supreme Court held:

> In this case, the State argues that this court should hold that *Pelkey* does not prevent the State from amending an information when the amendment corrects an omission of a statutory element when the defendant cannot show any prejudice from the amendment. As noted above, we rejected this argument in *Pelkey* and again in *Markle*; we again do so here.
>
> The State argues that the omission of the element of "premeditation" was only a "scrivener's" error and relies on the cases which hold that technical defects can be remedied midtrial. Convictions based on charging documents which contain only technical defects (such as an error in the statutory citation number or the date of the crime or the specification of a different manner of committing the crime charged) usually need not be reversed. However, omission of an essential statutory element cannot be considered a mere technical error. Sometimes errors made in charging documents are oversights in omitting an element of the crime, but for sound policy reasons founded in our state and federal constitutions, this court has nonetheless consistently adhered to the essential elements rule.
>
> In the present case, the information alleged only intent to cause death, not premeditation. Therefore, the State failed to charge one of the statutory elements of first degree murder and instead included only the mental element required for second degree murder. The State seeks to distinguish *Pelkey* and *Markle* on the basis that in those cases the State sought to change the crime charged after the State had rested, while in this case the State merely seeks to add an essential element. The fallacy in this argument is that by adding an element, the State changed the crime charged from attempted murder in the second degree to attempted murder in the first degree.
>
> This court drew a bright line in *Pelkey*, which we adhered to in *Markle* and in *Schaffer*. The rule that any amendment from one crime to a different crime after the State has rested its case is per se prejudicial error (unless the change is to a lesser included or lesser degree crime) protects the constitutional right of the accused to be informed of the nature of the

offense charged. A change in the rule would necessitate a reversal of both *Pelkey* and *Markle* and this we decline to do.

*Vangerpen*, 125 Wn.2d at 790-91 (footnotes omitted).

Similarly here, the L&I fraud statute includes as a statutory element that the false information be "required" in the L&I claim or application. The State's information failed to include this element until the final amendment, which the court approved after the State had rested its case in chief.[9]

*Vangerpen* is almost directly on point. One possible distinction is that in *Vangerpen* the omission of the statutory element resulted in a lesser charge, *Id.* at 791, while in this case the omission of the word "required" resulted in no viable charge. The *Vangerpen* court expressly discussed this distinction, and impliedly held the result should be the same when the original information "succeed[ed] in charging no crime at all." *Id.* at 795. The logic of *Pelkey* applies equally in both circumstances, because amendment of the information in both cases added a criminal charge of which the defendant was not previously on notice.

Applying the court's reasoning in *Pelkey*, *Markle*, and *Vangerpen*, the amendment was per se reversible error, and Mr. Hull is not required to demonstrate prejudice. The conviction therefore is reversed. The appropriate remedy in this circumstance is dismissal of the charge without prejudice to the State's right to recharge Mr. Hull. *Vangerpen*, 125 Wn.2d at 791-95; *cf. State v. Dallas*, 126 Wn.2d 324, 892 P.2d 1082 (1995). We therefore remand for entry of such an order.

---

[9]Defense counsel's objection at trial renders inapplicable the more liberal standard of review that applies when a defendant challenges the sufficiency of an information for the first time on appeal. *See Vangerpen*, 125 Wn.2d at 788; *State v. Kjorsvik*, 117 Wn.2d 93, 102, 812 P.2d 86 (1991).

Sweeney, C.J., and Munson, J., concur.

Review denied at 131 Wn.2d 1016 (1997).